07 CV 3918

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CEDARBAUM

-------------------------------------------------------------------x

PAUL H. LEGRAND,                                    :

                  Plaintiff,                     :

                            :    **COMPLAINT**

      -against-                            :

BARCLAYS CAPITAL, INC.                             :

                            :    MAY 18 2007

               Defendant.                    :

-------------------------------------------------------------------x

Plaintiff, Paul H. Legrand, by his attorneys, Liddle & Robinson, L.L.P., for his Complaint alleges as follows:

## THE PARTIES

1.    Plaintiff, Paul H. Legrand, was employed by Defendant, Barclays Capital Inc., ("Barclays"), in New York City as a salesperson in the Rate Sales Department, from on or about March 6, 2000 until June 19, 2006. Mr. Legrand currently resides at 187 Salem Road, Pound Ridge, New York.

2.    Upon information and belief, Barclays is a Delaware corporation with its principal place of business located at 200 Park Avenue, New York, New York.

NATURE OF THE ACTION

2.    This is a civil action for damages and remedies brought on behalf of the plaintiff for violations of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 et seq. and the New York City Human Rights Law §8-107; and retaliation under the ADEA, 29 U.S.C.A. § 626(b) and New York City Human Rights Law §8-107(7).

JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367(a).

4.    Mr. Legrand filed a Charge of Discrimination under the ADEA provisions with the United States Equal Employment Opportunity Commission ("EEOC") on November 20, 2006.

5.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the Southern District of New York is a district in which Barclays resides and because a substantial part of the events giving rise to plaintiff's claims occurred within the Southern District of New York.

FACTS

6.    Mr. Legrand is 57 years old and was born on April 4, 1950.

7.     Mr. Legrand began employment with Barclays on March 6, 2000. In his position as a salesperson in the Rate Sales Department, Mr. Legrand's primary role was as an institutional fixed income sales person transacting in treasury securities, federal agency securities, interest rate swaps and swaptions, and treasury inflation securities for large bank portfolios, insurance companies, mutual fund families, hedge funds and public and private pension funds. Other responsibilities included introducing other product department sales people to his customers to help expand Barclays' business, and organizing and running a luncheon series introducing institutional customers to Barclays.

8.     Mr. Legrand was qualified for his position and, throughout his employment with Barclays, Mr. Legrand received positive performance reviews of mainly 4s - out of a total of 5 - except for Mr. Legrand's 2003 Annual Review, when he received mostly 3's. A 3 rating still meets Barclays' expectations.

9.     2003, however, was one of Mr. Legrand's best years. Mr. Legrand exceeded the budget target of $6,198,000 set for him by Barclays by more than 20%.

10.     On March 7, 2006, Mr. Legrand's supervisor, Stephen Aronson told him that John Stathis, the National Sales Manager, was going to take away four of Mr. Legrand's accounts, including two of his most important: JPMorgan Chase & Co. ("JP Morgan") and Wachovia Corporation ("Wachovia"). The other two accounts were Apple Bank for Savings ("Apple Bank") and GMAC Commercial Mortgage ("GMAC-CM"). Mr. Legrand had brought all of these accounts to Barclays and had an

approximately 8 to 10 year relationship with each account. JP Morgan and Wachovia generated approximately 23.3 % of his total production in 2004 and 13.3% in 2005; all four of the accounts generated approximately 25.2% of Mr. Legrand's total production in 2004 and 15.5% in 2005. Additionally, JP Morgan's portfolio manager, Althea Dursten, had severed ties with Barclays after Mr. Legrand's predecessor had been fired. Mr. Legrand helped bring this account back to Barclays. Mr. Legrand also brought Wachovia, GMAC-CM and Apple Bank to Barclays (JP Morgan and Wachovia had business relationships with Barclays before Mr. Legrand's arrival, but they had not previously done business with Barclays in the sectors that Mr. Legrand covered; Mr. Legrand therefore "brought" this business with him when he joined Barclays. GMAC-CM and Apple Bank were new clients of Barclays).

11.     Mr. Legrand returned to his office, called the accounts that were to be transferred and informed them of the impending change. He was told by each account that they conducted business with Barclays because of their relationship with Mr. Legrand, not because of their relationship with Barclays. Mr. Legrand relayed this information to Mr. Aronson.

12.     Mr. Legrand met with Mr. Aronson again on March 10, 2006. Mr. Aronson communicated that that Mr. Stathis was adamant that the accounts would be transferred away from Mr. Legrand. Mr. Aronson also communicated that Mr. Stathis had said that if Mr. Legrand did not go along with the decision, then Mr. Legrand would be immediately terminated.

13.    Mr. Legrand was shocked by the events. He had recently completed a record production year for 2005 of approximately $13 million and had made at least 10 client introductions – a significant number - to other departments within Barclays.

14.    The week of March 13, Mr. Legrand met with his contact at JP Morgan who informed him that the policy of the JP Morgan portfolio was to take a very dim view of dealers who arbitrarily changed salespeople without first clearing it with the portfolio. Mr. Legrand's contact further stated that they conducted business with Barclays mostly due to their relationship with Mr. Legrand.

15.    Mr. Legrand recognized that the account transfers were a prelude to an adverse employment action. He had noticed in the past that large accounts were transferred away from more senior and older salespeople, and felt that this was an attempt to weed out the older ranks. Mr. Legrand had specifically seen that older salespeople such as Pam Smyth, Maria Palamero, Shelly Rey and Steven Chmil had accounts transferred away from them to more junior people during this time frame.  Mr. Legrand had also heard rumors that Barclays was attempting to force out older employees by making it difficult for them to make their budgets. For example, Mr. Legrand's 4 major accounts were transferred to an individual who was approximately 20 years his junior, while Mr. Legrand, in his entire 6 years of having been at Barclays, had only been given one small sales account, the T. Rowe Price account with a value of approximately $147,000 in

production. Mr. Legrand also found out through first hand knowledge that junior salespeople, such as Tracey Rowley, were being hired at sums significantly higher than his total compensation and given large accounts upon arrival.

16.    On March 29, 2006, Mr. Legrand met with Mr. Stathis. Mr. Aronson made a brief appearance but did not participate in the meeting. Mr. Legrand questioned Mr. Stathis on the need to remove these four accounts, especially when Mr. Legrand had already built strong personal relationships with these different accounts. He also questioned Mr. Stathis as to why his percentage of compensation for production had been going down every year since his arrival while at the same time the production scale was also being reduced, especially in light of the fact that Barclays paid considerable amounts to recruit more production associates and actually paid higher compensation to junior associates with less experience, less significant accounts and less production. Upon information and belief, this pattern continued even after Mr. Legrand's termination when new, younger sales people were hired to cover Mr. Legrand's former customers. He reiterated his view that they were transferring accounts away from older salespeople to more junior salespeople who had very few accounts of their own.

17.    Mr. Legrand also expressed his concern to Mr. Stathis that by taking away his major accounts, they were going to impede his ability to make his budget, which in turn would substantially reduce his total compensation. For example, his previous year's compensation had been reduced from $670,000 to $600,000 even though he only missed his budget by a miniscule amount. Mr. Stathis informed Mr. Legrand that

he understood that if Mr. Legrand helped "execute that game plan" that Barclays, having put him in this position, would have to help him succeed. Mr. Stathis further stated that Mr. Legrand should not be penalized for giving up production.

18.    Mr. Legrand additionally informed Mr. Stathis in this meeting that he noticed that he and other older salespeople were losing accounts to younger, more junior salespeople who had not brought in any accounts of their own and that the younger salespeople were not losing accounts.

19.    Nevertheless, at the conclusion of this meeting, Mr. Legrand agreed to help Mr. Stathis effectuate a smooth change of accounts so that Barclays would retain the accounts despite the possibility that these accounts might be wary of working with a salesperson with whom they did not have a previous relationship.

20.    Contrary to the message conveyed by Mr. Stathis during the March 29, 2006 meeting, Mr. Stathis' Chief Operating Officer Rajul Mamgain later told Mr. Legrand that he would have to make his budget through his existing accounts despite the loss of at least 15% of his account value. Therefore, in early April, Mr. Legrand immediately visited some of his other accounts in Baltimore, Toronto and Montreal in order to boost his production.

21.    On April 6, 2006, Mr. Aronson told Mr. Legrand that Mr. Stathis had made a decision that three of Mr. Legrand's accounts would be transferred to a

7

younger salesman, Kashif Zafar. He was told that his JP Morgan account would be split, with Mr. Zafar's group covering the derivative business and Mr. Legrand covering the cash business. Mr. Legrand noted that there might be a problem because most JP Morgan employees transact both types of business and it might be cumbersome for them to deal with two people. Mr. Legrand suggested a refinement of the plan that Mr. Aronson passed on this recommendation to Mr. Stathis via telephone during the meeting. Nevertheless, Mr. Stathis told Mr. Aronson that if he wanted to be a manager he should execute Mr. Stathis' orders. Following the telephone conversation, Mr. Aronson threw the telephone across the room.

22.    On April 6, 2006, Mr. Legrand met again with Mr. Zafar and Mr. Aronson to discuss the account transfers. Mr. Legrand asked Mr. Zafar why Mr. Zafar was taking Mr. Legrand's accounts and why he didn't just transfer Mr. Legrand into his group instead. Mr. Zafar had no answer regarding the transferring of Mr. Legrand. Mr. Zafar did state, however, that the sales production totals of these accounts were not that significant and therefore would not represent a loss to Mr. Legrand (which was false; they represented a major loss to Mr. Legrand). Mr. Zafar also falsely insinuated that Mr. Legrand was not doing his job well. Mr. Zafar, at the time of the account transfers, was a co-head of production with no account responsibilities and had not worked in the industry for about a year before being hired by Mr. Stathis.

23.    On April 13, 2006, Mr. Legrand's counsel spoke with Barclays Human Resources employee, Jaime Garstad, to inform her that Mr. Legrand had raised a

claim of age discrimination and was concerned that the account transfers were being done in a way that would make it nearly impossible for Mr. Legrand to meet his budget of $13 million and thereby give Barclays a pretextual reason for termination.

24.     On April 17, 2006 Mr. Aronson promised Mr. Legrand that he would get the best accounts that became available in order to make up for lost account production. Mr. Legrand then told Mr. Aronson that Wachovia was on the verge of a large trade and he wanted to make sure that coverage was in place so that Barclays would benefit from the trade. After this meeting, Mr. Legrand then went over to Will John, Treasury Securities Head Trader, and informed him that Wachovia was on the verge of this trade.

25.     On April 18, 2006, Mr. Legrand was asked to come down to the third floor, where he met with Ms. Garstad and Mr. Aronson. Mr. Legrand was abruptly terminated without cause.

26.     Mr. Legrand's actual termination date, as listed on his U-5, is June 19, 2006.

## FIRST CLAIM

### (Age Discrimination Under the ADEA)

27.     Mr. Legrand repeats and realleges the allegations contained in paragraphs 1 through 26 as if separately set forth herein.

28.    At all relevant times, Mr. Legrand was an "employee" under the ADEA, 29 U.S.C. § 630(f), and was over 40 years old.

29.    Barclays is an "employer" under the ADEA, 29 U.S.C. § 630(b).

30.    Barclays' conduct toward Mr. Legrand constitutes discrimination with respect to his compensation, terms, conditions or privileges of employment because of his age in violation of the ADEA, 29 U.S.C.A. § 623(a) et seq.

31.    Barclays's discriminatory conduct was willful.  Mr. Legrand is therefore entitled to liquidated damages pursuant to 29 U.S.C. § 626(b). By reason of the foregoing, Barclays is liable to Mr. Legrand for back pay, front pay or reinstatement, liquidated damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined.

## SECOND CLAIM

### (Retaliation Under the ADEA)

32.    Mr. Legrand repeats and realleges the allegations contained in paragraphs 1 through 26 as if separately set forth herein.

33.    At all relevant times, Mr. Legrand was an "employee" under the ADEA, 29 U.S.C. § 630(f), and was over 40 years old.

34.     Barclays is an "employer" under the ADEA, 29 U.S.C. § 630(b).


35.     Barclays' conduct towards Mr. Legrand constitutes retaliation in violation of the ADEA, 29 U.S.C.A. § 623(d).


36.     Barclays' discriminatory conduct was willful.    Mr. Legrand is therefore entitled to liquidated damages pursuant to 29 U.S.C. § 626(b). By reason of the foregoing, Barclays is liable to Mr. Legrand for back pay, front pay or reinstatement, liquidated damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined.


### THIRD CLAIM

(Age Discrimination Under the New York City Human Rights Law)


37.     Mr. Legrand repeats and realleges the allegations contained in paragraphs 1 through 26 as if separately set forth herein.


38.     Mr. Legrand is a "person" under § 8-102(1) of the New York City Human Rights Law.


39.     Barclays is an "employer" under §8-107(1)(a) of the New York City Human Rights Law.

40.   Barclays' conduct towards Mr. Legrand constitutes willful discrimination.

41.   As a result of Barclays' discriminatory conduct, Mr. Legrand has suffered substantial damages, including emotional distress, in an amount as yet undetermined.

42.   On information and belief, Barclays' discriminatory conduct was taken with reckless indifference to Mr. Legrand's rights, entitling Mr. Legrand to punitive damages under the New York City Human Rights Law.

43.   By reason of the foregoing, Barclays' is liable to Mr. Legrand for back pay, front pay or reinstatement, compensatory damages, punitive damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined.

FOURTH CLAIM

(Retaliation Under the New York City Human Rights Law)

44.   Mr. Legrand repeats and realleges the allegations contained in paragraphs 1 through 26 as if separately set forth herein.

45.   Mr. Legrand is a "person" under § 8-102(1) of the New York City Human Rights Law.

12

46.     Barclays is an "employer" under §8-107(1)(a) of the New York City Human Rights Law.

47.     Barclays' termination of Mr. Legrand after he complained about being discriminated against based on his age, constitutes retaliation in violation of New York City Human Rights Law §8-107(7).

48.     By reason of the foregoing, Barclays' is liable to Mr. Legrand for back pay, front pay or reinstatement, compensatory damages, punitive damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined.

WHEREFORE, Plaintiff demands judgment against Barclays as follows:

A.     On the First Claim under the ADEA, compensatory damages including back pay, front pay or reinstatement, liquidated damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined;

B.     On the Second Claim under the ADEA, compensatory damages including back pay, front pay or reinstatement, liquidated damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined;

B.     On the Third Claim under the New York City Human Rights Law, compensatory damages including back pay, front pay or reinstatement, punitive damages

13

compensatory damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined;

        C.      On the Fourth Claim under the New York City Human Rights Law, compensatory damages including back pay, front pay or reinstatement, punitive damages, pre-judgment interest, attorneys' fees and costs, in amounts as yet undetermined;

        D.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:      New York, New York
              May 18, 2007

                            LIDDLE & ROBINSON, L.L.P.

                            By:_____

                            Blaine H. Bortnick (BB 3680)
                            Dina N. Weinberg (DW 2822)
                            *Attorneys for Plaintiff*
                            800 Third Avenue
                            New York, New York 10022
                            (212) 687-8500